# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
### LEXINGTON DIVISION

STATE OF OKLAHOMA,

OKLAHOMA HORSE RACING
COMMISSION,

STATE OF WEST VIRGINIA,

WEST VIRGINIA RACING COMMISSION,

STATE OF LOUISIANA,

HANOVER SHOE FARMS, INC.,

UNITED STATES TROTTING
ASSOCIATION,

OKLAHOMA QUARTER HORSE RACING
ASSOCIATION,

TULSA COUNTY PUBLIC FACILITIES
AUTHORITY D/B/A FAIR MEADOWS
RACING AND SPORTS BAR,

GLOBAL GAMING RP, LLC D/B/A
REMINGTON PARK,

WILL ROGERS DOWNS LLC,

                    Plaintiffs,

    v.

THE UNITED STATES OF AMERICA,

HORSERACING INTEGRITY AND
SAFETY AUTHORITY, INC.,

STEVE BESHEAR,

ADOLPHO BIRCH,

LEONARD S. COLEMAN, JR.,

ELLEN MCCLAIN,

Civil Action No. 5:21-cv-00104-JMH

CHARLES SCHEELER,

JOSEPH DEFRANCIS,

SUSAN STOVER,

BILL THOMASON,

D.G. VAN CLIEF,

FEDERAL TRADE COMMISSION,

LINA KHAN, in her official capacity as Chair
of the Federal Trade Commission,

REBECCA KELLY SLAUGHTER, in her
official capacity as Commissioner of the
Federal Trade Commission,

NOAH JOSHUA PHILLIPS, in his official
capacity as Commissioner of the Federal Trade
Commission,

ROHIT CHOPRA, in his official capacity as
Commissioner of the Federal Trade
Commission,

CHRISTINE S. WILSON, in her official
capacity as Commissioner of the Federal Trade
Commission,

Defendants.

## FIRST AMENDED COMPLAINT FOR A
## DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

1.     Plaintiffs the State of Oklahoma, the Oklahoma Horse Racing Commission

("OHRC"), the State of West Virginia, the West Virginia Racing Commission ("WVRC"),

the State of Louisiana, Hanover Shoe Farms, Inc. ("Hanover"), the United States Trotting Association

("USTA"), the Oklahoma Quarter Horse Racing Association ("OQHRA"), Tulsa County Public

Facilities Authority d/b/a Fair Meadows Racing and Sports Bar ("Fair Meadows"), Global Gaming

RP, LLC d/b/a Remington Park ("Remington Park"), and Will Rogers Downs LLC allege as follows:

## PRELIMINARY STATEMENT

2.      On December 27, 2020, Congress enacted the Horseracing Integrity and Safety Act of 2020 ("HISA").  HISA purports to recognize a private, nonprofit corporation known as the Horseracing Integrity and Safety Authority (the "Authority"), and to bestow on the Authority significant regulatory power over the horseracing industry.  The Authority is given the power to promulgate rules governing doping, medication control, and racetrack safety in horseracing; to investigate violations of those rules by issuing and enforcing subpoenas; to adjudicate violations of its rules; to bring civil actions in federal court in response to known or anticipated violations in order to enforce its regulations; and to discipline violators with sanctions up to and including lifetime bans from horseracing, disgorgement of purses, and monetary fines and penalties.  The Authority also possesses unlimited and unguided discretion to expand HISA's scope to include any breed of horse.

3.      HISA grants the Authority broad regulatory power, yet the Authority is unaccountable to any political actor.  The Authority has the exclusive power to craft regulations relating to doping, medication control, and racetrack safety in horseracing.  HISA relegates the Federal Trade Commission (the "Commission") to a ministerial role in which it is required to approve and issue certain of the Authority's regulations so long as they are consistent with HISA and "applicable rules approved by the Commission."  And no federal official can remove the members of the Authority's Board of Directors.  HISA thus delegates to a private body the full coercive power of the federal government while simultaneously making it completely unaccountable to the people.

4.      After creating this vast new federal regulatory structure and delegating it to a private corporation, Congress disclaimed any responsibility for funding the Authority itself. Instead, it forced the funding responsibility onto the states, imposing on them the choice of either funding the Authority with state funds or, if a state refuses, collecting fees directly from racing industry participants in that state while punishing the state by banning it from collecting similar taxes or fees itself.

5.      This regime violates the U.S. Constitution in several ways.  First, HISA confers significant regulatory and taxation power on the Authority and the anti-doping and medication-control enforcement agency (both private actors) in violation of the Constitution's private non-delegation doctrine, which prohibits Congress from giving governmental authority to private actors.

6.      Second, HISA delegates the discretion to expand its regulatory scope to cover non-Thoroughbred horse breeds without any intelligible principle to guide that discretion.  This violates the Constitution's non-delegation doctrine, which prohibits Congress from delegating its legislative powers to other entities.  HISA subjects all those involved in the Standardbred and sprint-breed horseracing industries, including the USTA's members, the OQHRA's members, and Hanover, to the significant risk of regulation and a credible threat of enforcement actions against them.

7.      Third, by forcing states to either fund the Authority or abandon any ability to impose or collect taxes or fees to fund similar state activities, HISA unconstitutionally commandeers the legislative and executive branches of state government.  Forcing a state legislature to either appropriate dollars for a private corporation or be banned from passing legislation imposing certain taxes or fees—or doing the same thing to a state executive agency—

puts Congress in control of state branches of government in violation of the Tenth Amendment. And by forcing state law-enforcement agencies to cooperate and provide information to the Authority, HISA unconstitutionally commandeers the executive branches of the states. Conscripting the states to help enforce HISA's regulatory program violates the Tenth Amendment as well as the Constitution's structural principle that the federal government must act directly on the people when it exercises its enumerated powers and may not commandeer the states as instruments to achieve its ends.

8.     Fourth, HISA permits—and in fact requires—economically self-interested members of the equine industry to be involved in the Authority's decision-making process, which violates the Due Process Clause of the Fifth Amendment.

9.     Fifth, should the Authority be considered a governmental entity (though HISA affirmatively states that the Authority is a private entity), its structure would violate the Appointments Clause of the Constitution.  The members of the Authority's Board of Directors would be officers of the United States, but they are not appointed by the President, a court of law, or a department head, nor are they nominated by the President and confirmed by the Senate, as the Constitution would require.

10.     Sixth, if the Authority is a governmental entity, HISA would violate Article II and the Constitution's separation of powers.  Congress has created an entity whose members cannot be removed by the President—or indeed by any other federal employee—*at all*.  Such a regulatory agency is completely unaccountable to the President, in whom the Constitution vests all executive power.

11.     Plaintiffs thus bring this action for declaratory and injunctive relief and pray that this Court: (1) declare that HISA violates the U.S. Constitution on its face and is therefore void;

(2) enjoin the defendants from taking any action pursuant to HISA; and (3) award nominal damages.

**PARTIES**

12.     Plaintiff State of Oklahoma is a sovereign State of the United States of America. The Oklahoma Office of the Attorney General is authorized to bring legal actions on behalf of the State of Oklahoma and its citizens.  Okla. Stat. tit. 74, § 18b.  For the purposes of this case, the State of Oklahoma's county of residence is Oklahoma County, Oklahoma.

13.     Plaintiff Oklahoma Horse Racing Commission is a state agency of the State of Oklahoma and is responsible for regulating horseracing integrity and safety in the State of Oklahoma.  Its county of residence is Oklahoma County, Oklahoma.

14.     Plaintiff State of West Virginia is a sovereign State of the United States of America. Attorney General Patrick Morrisey is authorized to bring legal actions on behalf of the State of West Virginia and its citizens.  W. Va. Const. art. VII, § 1; W. Va. Code § 5-3-2; *see also State ex rel. McGraw v. Burton*, 569 S.E.2d 99, 101–02 (W. Va. 2002).  For the purposes of this case, the State of West Virginia's county of residence is Kanawha County, West Virginia.

15.     Plaintiff West Virginia Racing Commission is a public corporation pursuant to West Virginia Code Chapter 19, Article 23, and is located in Charleston, Kanawha County, West Virginia.  The WVRC is charged by statute with the promotion of Thoroughbred horse breeding in the State of West Virginia and has full jurisdiction over and supervises all horse-race meetings and all persons involved in the holding or conducting of horse-race meetings in West Virginia.

16.     Plaintiff State of Louisiana is a sovereign State of the United States of America. Attorney General Jeff Landry is authorized to bring legal actions on behalf of the State of Louisiana

and its citizens.  La. Const. art. IV, § 8.  For the purposes of this case, the State of Louisiana's parish of residence is East Baton Rouge Parish, Louisiana.

17.     Plaintiff Hanover Shoe Farms, Inc. is a Pennsylvania corporation with its principal place of business in Hanover, Adams County, Pennsylvania.  Hanover is a world-class horse-breeding farm that has raised horses that compete in harness racing, including numerous winners of harness racing's most prestigious races, such as the Hambletonian, Kentucky Futurity, Little Brown Jug, and Breeders Crown.  As a breeder of racehorses, Hanover is subject to a substantial risk of future regulation and enforcement actions under HISA.

18.     Plaintiff United States Trotting Association is a nonprofit association of Standardbred horse owners, breeders, drivers, trainers, and officials headquartered in Columbus, Franklin County, Ohio.  The USTA's members are subject to a substantial risk of regulation and enforcement actions under HISA.

19.     Plaintiff Oklahoma Quarter Horse Racing Association is a nonprofit association that includes people affiliated with racing sprint-breed horses (Quarter Horses, Paints, and Appaloosas), including owners, breeders, drivers, trainers, and officials.  The OQHRA's members are subject to the risk of regulation and enforcement actions under HISA.  It is headquartered in Edmond, Oklahoma, and its county of residence is Oklahoma County, Oklahoma.

20.     Plaintiff Tulsa County Public Facilities Authority, an Oklahoma public trust, d/b/a Fair Meadows Racing and Sports Bar, is an entity that conducts horse races in Tulsa, Oklahoma. It is headquartered in Tulsa, Tulsa County, Oklahoma.  As a Thoroughbred racetrack, Fair Meadows is subject to regulation and the risk of enforcement actions under HISA.

21.     Plaintiff Global Gaming RP, LLC, is an Oklahoma limited-liability company that leases and operates the Remington Park casino and racetrack near Oklahoma City, Oklahoma, and

does business as Remington Park.  It is headquartered in Ada, Pontotoc County, Oklahoma.  As a Thoroughbred racetrack, Remington Park is subject to regulation and the risk of enforcement actions under HISA.

22.     Plaintiff Will Rogers Downs LLC is an Oklahoma limited-liability company that operates the Will Rogers Downs racetrack near Tulsa, Oklahoma.  It is headquartered in Oklahoma City, Oklahoma County, Oklahoma.  As a Thoroughbred racetrack, Will Rogers Downs LLC is subject to regulation and the risk of enforcement actions under HISA.

23.     Defendant the United States of America is sued as a party to a claim seeking injunctive decrees against federal officers.  *See* 5 U.S.C. § 702.  Its county of residence is the District of Columbia.

24.     Defendant Horseracing Integrity and Safety Authority, Inc. is a nonprofit corporation chartered under the laws of Delaware with its principal place of business at 250 W. Main Street, Lexington, Fayette County, KY 40507.  HISA delegates to the Authority the power to draft regulations that implement a horseracing anti-doping and medication-control program as well as a racetrack-safety program.

25.     Defendant Steve Beshear is an independent director serving on the Board of Directors of the Authority.  He served as the Governor of Kentucky between 2007 and 2015.  On information and belief, Beshear resides in Lexington, Fayette County, Kentucky.

26.     Defendant Adolpho Birch is an independent director serving on the Board of Directors of the Authority.  He is senior vice president of business affairs and the chief legal officer for the Tennessee Titans.  On information and belief, Birch resides in Nashville, Davidson County, Tennessee.

27.     Defendant Leonard S. Coleman, Jr. is an independent director serving on the Board of Directors of the Authority.  He served as the president of the National League of Professional Baseball Clubs from 1994 to 1999.  On information and belief, Coleman resides in Palm Beach, Palm Beach County, Florida.

28.     Defendant Ellen McClain is an independent director serving on the Board of Directors of the Authority.  She serves as chief operating officer for the nonprofit organization Year Up.  On information and belief, McClain resides in New York, Bronx County, New York.

29.     Defendant Charles Scheeler is an independent director serving on the Board of Directors of the Authority.  He is a retired partner at the law firm DLA Piper.  On information and belief, Scheeler resides in Towson, Baltimore County, Maryland.

30.     Defendant Joseph DeFrancis is an industry director serving on the Board of Directors of the Authority.  He is the managing partner of Gainesville Associates, LLC.  On information and belief, DeFrancis resides in Columbia, Howard County, Maryland.

31.     Defendant Susan Stover is an industry director serving on the Board of Directors of the Authority.  She is a professor of surgical and radiological sciences at the University of California, Davis, School of Veterinary Medicine.  On information and belief, Stover resides in Winters, Yolo County, California.

32.     Defendant Bill Thomason is an industry director serving on the Board of Directors of the Authority.  He is the former president and CEO of Keeneland Association, Inc., a Thoroughbred racetrack and horse-auction complex.  On information and belief, Thomason resides in Lexington, Fayette County, Kentucky.

33.     Defendant D.G. Van Clief is an industry director serving on the Board of Directors of the Authority.  He was previously president of the Breeders' Cup.  On information and belief, Van Clief resides in Charlottesville, Albemarle County, Virginia.

34.     Defendant Federal Trade Commission is a U.S. governmental agency headquartered in Washington, D.C.  HISA delegates to the Commission a limited power to approve or disapprove certain of the Authority's draft regulations governing horseracing anti-doping, medication control, and racetrack safety.  Its county of residence is the District of Columbia.

35.     Defendant Lina Khan is the Chair of the Federal Trade Commission.  Plaintiffs are suing Chair Khan in her official capacity.  Accordingly, her county of residence is the District of Columbia.

36.     Defendant Rebecca Kelly Slaughter is a Commissioner of the Federal Trade Commission.  Plaintiffs are suing Commissioner Slaughter in her official capacity.  Accordingly, her county of residence is the District of Columbia.

37.     Defendant Noah Joshua Phillips is a Commissioner of the Federal Trade Commission.  Plaintiffs are suing Commissioner Phillips in his official capacity.  Accordingly, his county of residence is the District of Columbia.

38.     Defendant Rohit Chopra is a Commissioner of the Federal Trade Commission.  Plaintiffs are suing Commissioner Chopra in his official capacity.  Accordingly, his county of residence is the District of Columbia.

39.     Defendant Christine S. Wilson is a Commissioner of the Federal Trade Commission.  Plaintiffs are suing Commissioner Wilson in her official capacity.  Accordingly, her county of residence is the District of Columbia.

## JURISDICTION AND VENUE

40.     This action arises under the U.S. Constitution.  This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331.  Additionally, this Court has jurisdiction under 28 U.S.C. § 1346(a)(2) over this civil action against the United States and has jurisdiction under 28 U.S.C. § 1361 to issue an injunction against officers or employees of federal agencies. The Court is authorized to issue the nonmonetary relief sought herein pursuant to law and its inherent equitable powers.  *See* 28 U.S.C. §§ 2201–2202; Fed. R. Civ. P. 57, 65.

41.     Venue is proper in this Court as to the federal defendants under 28 U.S.C. § 1391(e)(1) because this is an action against officers and an agency of the United States, a defendant in the action resides in this District, and a substantial part of the events or omissions giving rise to the claim occurred in the Lexington Division of this District.

42.     Venue is proper in this Court as to the remaining defendants under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in the Lexington Division of this District and, alternatively, because multiple defendants are subject to this Court's personal jurisdiction with respect to this action.

## FACTUAL ALLEGATIONS

### I.     The Horseracing Integrity And Safety Act Of 2020

43.     On December 27, 2020, as part of the Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, 134 Stat. 1182 (2020), Congress passed the Horseracing Integrity and Safety Act of 2020.  *Id.* div. FF, tit. XII, § 1201, 134 Stat. at 3252.[1]

---

[1]  For ease of reference, all references to Title XII, Division FF of the Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, 134 Stat. 1182 (2020), shall be styled "HISA."

A.      **The Regulatory Structure Of The Authority**

44.     HISA recognizes "[t]he private, independent, self-regulatory, nonprofit corporation, to be known as the 'Horseracing Integrity and Safety Authority,' . . . for purposes of developing and implementing a horseracing anti-doping and medication control program and a racetrack safety program for covered horses, covered persons, and covered horseraces."  HISA § 1203(a), 134 Stat. at 3253.

45.     HISA defines the term "covered horse" as

> any Thoroughbred horse, or any other horse made subject to [HISA] by election of the applicable State racing commission or the breed governing organization for such horse . . . during the period—(A) beginning on the date of the horse's first timed and reported workout at a racetrack that participates in covered horseraces or at a training facility; and (B) ending on the date on which the Authority receives written notice that the horse has been retired.

HISA § 1202(4), 134 Stat. at 3252.

46.     While HISA by default applies only to Thoroughbred horses, "[a] State racing commission or a breed governing organization for a breed of horses other than Thoroughbred horses may elect to have such breed be covered by [HISA]" by filing an election form and obtaining the Authority's approval; if it is a state racing commission that makes the election, the expanded coverage to the requested breed will apply only in that state.  HISA § 1205(l)(1), 134 Stat. at 3263.  If the state racing commission or breed-governing organization elects to expand HISA's coverage, it must put "in place a mechanism to provide sufficient funds to cover the costs of the administration of [HISA] with respect to the horses that will be covered" due to the election; the Authority will then "apportion costs" attributable to this election "fairly among all impacted segments of the horseracing industry, subject to approval by the Commission in accordance with section 1204."  *Id.* § 1205(l)(2)–(3), 134 Stat. at 3263.

47.     HISA defines the term "covered horserace" as "any horserace involving covered horses that has a substantial relation to interstate commerce." HISA § 1202(5), 134 Stat. at 3252.

48.     HISA defines the term "covered persons" as "all trainers, owners, breeders, jockeys, racetracks, veterinarians, persons (legal and natural) licensed by a State racing commission and the agents, assigns, and employees of such persons and other horse support personnel who are engaged in the care, training, or racing of covered horses." HISA § 1202(6), 134 Stat. at 3252.

49.     HISA defines a "breeder" as "a person who is in the business of breeding covered horses" and defines "owner" as "a person who holds an ownership interest in one or more covered horses." HISA § 1202(2), (13), 134 Stat. at 3252–53.

50.     The Authority is governed by a nine-member Board of Directors, consisting of five "independent members selected from outside the equine industry," one of whom shall be the Chairman, and four "industry members selected from among the various equine constituencies," provided that the Board "include not more than one industry member from any one equine constituency." HISA § 1203(b)(1)–(2), 134 Stat. at 3253–54.

51.     HISA also creates a "nominating committee of the Authority," which is "comprised of seven independent members selected from business, sports, and academia," with its initial composition to be set forth in the Authority's governing corporate documents. HISA § 1203(d)(1), 134 Stat. at 3255.

52.     HISA does not grant any governmental entity, official, or employee the right to approve or disapprove the members selected to compose the nominating committee.

53.     The initial co-chairs of the nominating committee for the Authority are Leonard S. Coleman, Jr. and Nancy M. Cox.

54. HISA provides that vacancies on the nominating committee "shall be filled by the Board pursuant to rules established by the Authority." HISA § 1203(d)(1)(C), 134 Stat. at 3255.

55. The nominating committee selects the initial members of the Board of the Authority and its standing committees. HISA § 1203(d)(3)(A), 134 Stat. at 3255. Thereafter, it "recommend[s] individuals to fill any vacancy on the Board" or its standing committees. *Id.* § 1203(d)(3)(B), 134 Stat. at 3255.

56. HISA does not grant any governmental entity, official, or employee the right to approve or disapprove the nominating committee's selection of members of the Board of the Authority.

57. Any person who (1) "has a financial interest in, or provides goods or services to, covered horses"; (2) is an "official or officer—(A) of an equine industry representative; or (B) who serves in a governance or policymaking capacity" for such a representative; (3) is an employee of, or a person with a business relationship with, any of the above; or (4) is an immediate family member of (1) or (2) may not be a member of the Board or an independent member of a nominating or standing committee. HISA § 1203(e), 134 Stat. at 3255.

58. The nominating committee announced its selections for the initial composition of the Board on May 5, 2021. It named Steve Beshear, Leonard Coleman, Ellen McClain, Charles Scheeler, and Adolpho Birch as independent directors. It named Joseph DeFrancis, Susan Stover, Bill Thomason, and D.G. Van Clief as industry directors.

59. Joseph DeFrancis was previously the CEO and controlling shareholder of the Maryland Jockey Club, which is the operator of the Pimlico Race Course, home to the Preakness Stakes. And he has served on the board of the National Thoroughbred Racing Association.

60.     Bill Thomason is the former president and CEO of Keeneland Association, Inc., a Thoroughbred racetrack and horse-auction complex.  He retired from this position in summer 2020.

61.     D.G. Van Clief was previously president of the Breeders' Cup, was chairman of the Thoroughbred auction house Fasig-Tipton, and his family operated the horse farm Nydrie Stud for generations.

62.     As for the supposedly independent Board members, Adolpho Birch is senior vice president of business affairs and the chief legal officer for the Tennessee Titans, a football team that competes with horseracing in the market for sports entertainment.

63.     Leonard Coleman, an "independent" member of the Board, was formerly president of the National League of Professional Baseball Clubs, a competitor with horseracing in the sports entertainment market.  And he formerly served on the board of Churchill Downs, the racetrack home to the Kentucky Derby.

64.     And Ellen McClain, yet another "independent" Board member, was previously the president of the New York Racing Association, the operator of the three largest Thoroughbred racetracks in New York.

65.     HISA directs the Authority to obtain its initial funding through the program's effective date by securing loans.  HISA § 1203(f)(1)(A), 134 Stat. at 3255.  Thereafter, no later than 90 days before the effective date and no later than "November 1 each year thereafter," HISA instructs the Authority to "determine and provide to each State racing commission the estimated amount required from the State" for "the State's proportionate share of the horseracing anti-doping and medication control program and the racetrack safety program for the next calendar year" and

"to liquidate the State's proportionate share of any loan or funding shortfall in the current calendar year and any previous calendar year." *Id.* § 1203(f)(1)(C)(i), 134 Stat. at 3255–56.

66.     The program effective date is July 1, 2022.  HISA § 1202(14), 134 Stat. at 3253.

67.     Each state's proportional share is based on the Authority's annual budget for the following year and "the projected amount of covered racing starts for the year in each State." HISA § 1203(f)(1)(C)(ii)(I), 134 Stat. at 3256.

68.     Under HISA, states are forced to adopt one of two options for funding the Authority.  First, a state racing commission may "elect[] to remit fees" and, if they do so, "the election shall remain in effect and the State racing commission shall be required to remit fees . . . according to a schedule established in rule developed by the Authority and approved by" the Federal Trade Commission.  HISA § 1203(f)(2), 134 Stat. at 3256–57.  The state racing commission must give the Authority at least one year's notice before it withdraws that election. *Id.* § 1203(f)(2)(C), 134 Stat. at 3256.

69.     Second, if a state refuses to pay the fees demanded by the private corporation, the Authority shall, at least monthly, "calculate the applicable fee per racing start multiplied by the number of racing starts in the State during the preceding month."  HISA § 1203(f)(3)(A), 134 Stat. at 3257.  The Authority will then "allocate equitably the amount calculated . . . among covered persons involved with covered horseraces pursuant to such rules as the Authority may promulgate," and the Authority will directly collect fees from the covered persons, who "shall be required to remit such fees to the Authority."  *Id.* § 1203(f)(3)(B)–(C), 134 Stat. at 3257.  If a state chooses this second route, however, a punishment follows:  HISA prohibits that state racing commission from "impos[ing] or collect[ing] from any person a fee or tax relating to anti-doping

16

and medication control or racetrack safety matters for covered horseraces."  *Id.* § 1203(f)(3)(D), 134 Stat. at 3257.

70.     That the States are forced to fund this private regulatory corporation empowered by Congress, instead of Congress itself, is made explicit:  "Nothing in this Act shall be construed to require . . . the appropriation of any amount to the Authority; or . . . the Federal Government to guarantee the debts of the Authority."  HISA § 1203(f)(5), 134 Stat. at 3257.

71.     By giving the Authority the power to collect fees from members of the horseracing industry and requiring those members to comply with the Authority's demands, HISA § 1203(f)(3)(B)–(C), 134 Stat. at 3257, HISA also effectively delegates to a private entity the uniquely governmental power of taxation.

72.     HISA requires the Authority to submit to the Federal Trade Commission proposed rules or proposed modifications of rules relating to (1) its bylaws; (2) "a list of permitted and prohibited medications, substances, and methods, including allowable limits of permitted medications, substances, and methods"; (3) "laboratory standards for accreditation and protocols"; (4) "standards for racing surface quality maintenance"; (5) "racetrack safety standards and protocols"; (6) "a program for injury and fatality data analysis"; (7) "a program of research and education on safety, performance, and anti-doping and medication control"; (8) "a description of safety, performance, and anti-doping and medication control rule violations applicable to covered horses and covered persons"; (9) "a schedule of civil sanctions for violations"; (10) "a process or procedures for disciplinary hearings"; and (11) "a formula or methodology for determining assessments" against state racing commissions or covered persons.  HISA § 1204(a), 134 Stat. at 3257–58.

73.     For these types of rules, the Commission must publish the Authority's proposed rule or modification in the Federal Register and provide an opportunity for public comment.  HISA § 1204(b), 134 Stat. at 3258.  Within 60 days of publication in the Federal Register, the Commission must approve the Authority's proposed rule or modification so long as it is "consistent with" the Act and with "applicable rules approved by the Commission."  HISA § 1204(c), 134 Stat. at 3258.  For "any proposed rule, standard, or procedure developed by the Authority to carry out the horseracing anti-doping and medication control program or the racetrack safety program," the Authority must submit that proposal to the Commission for public notice and comment, but HISA does not explicitly state whether proposed rules submitted under this provision are subject to the procedural requirements of Section 1204(c), whether the Commission has the power to approve or disapprove them, or how they become effective.  *Id.* at § 1204(d), 134 Stat. at 3258.  Nor is it clear how the subject matter of rules submitted pursuant to Section 1204(d) might differ from the types of rules mentioned in Section 1204(a).

74.     The Commission may also adopt an interim final rule that takes effect immediately (pursuant to 5 U.S.C. § 553(b)(B)) if the Commission finds the rule "necessary to protect—(1) the health and safety of covered horses; or (2) the integrity of covered horseraces and wagering on those horseraces."  HISA § 1204(e), 134 Stat. at 3258.  Issuing an interim final rule in this way requires the agency to find "good cause . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest."  5 U.S.C. § 553(b)(B).  This exception is a "narrow" one for "exigent circumstance[s]," such as "emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare." *Chamber of Com. of U.S. v. SEC*, 443 F.3d 890, 908 (D.C. Cir. 2006) (citations omitted).

75.     Apart from the Commission's very narrow power to draft interim final rules in certain exigent circumstances, HISA does not permit the Commission to draft rules to regulate horseracing.  It can only approve or disapprove rules promulgated by the Authority.

76.     HISA does not permit the Commission to modify any rule promulgated by the Authority.  If the Commission disapproves the Authority's proposed rule or modification, it shall within 30 days of its disapproval "make recommendations to the Authority to modify the proposed rule or modification," and the Authority may resubmit a new proposed rule or modification incorporating the Commission's recommendations.  HISA § 1204(c)(3), 134 Stat. at 3258.

77.     HISA requires the Authority to "seek to enter into an agreement with the United States Anti-Doping Agency under which the Agency acts as the anti-doping and medication control enforcement agency under [HISA]."  HISA § 1205(e)(1)(A), 134 Stat. at 3260.  If the Authority is unable to enter into an agreement with the U.S. Anti-Doping Agency, HISA requires it to "enter into an agreement with an entity that is nationally recognized as being a medication regulation agency equal in qualification" to the U.S. Anti-Doping Agency.  *Id.* § 1205(e)(1)(B), 134 Stat. at 3260.  Whichever agency agrees to be the enforcement agency shall "implement[] the anti-doping and medication control program on behalf of the Authority."  *Id.* § 1205(e)(1)(E)(i), 134 Stat. at 3260.

### B.     The Powers And Duties Of The Authority

78.     HISA gives the Authority, the Commission, and the anti-doping and medication-control enforcement agency "independent and exclusive national authority over—(A) the safety, welfare, and integrity of covered horses, covered persons, and covered horseraces; and (B) all horseracing safety, performance, and anti-doping and medication control matters for covered horses, covered persons, and covered horseraces."  HISA § 1205(a)(2), 134 Stat. at 3259.  And

HISA gives the Authority, the Commission, and the anti-doping enforcement agency authority "similar to such authority of the State racing commissions before" July 1, 2022. *Id.* § 1205(a)(3), 134 Stat. at 3259.

79.     HISA then states that "[t]he rules of the Authority promulgated in accordance with [HISA] shall preempt any provision of State law or regulation with respect to matters within the jurisdiction of the Authority under [HISA]." HISA § 1205(b), 134 Stat. at 3259.

80.     Further, "[t]o avoid duplication of functions, facilities, and personnel, and to attain closer coordination and greater effectiveness and economy in administration of Federal and State law," in any case involving a violation of both the Authority's rules and state law, HISA requires "State law enforcement authorities" to "cooperate and share information" with the Authority. HISA § 1211(b), 134 Stat. at 3275.

### i.     The Horseracing Anti-Doping And Medication-Control Program

81.     Before July 1, 2022, the Authority, following the notice-and-comment procedures above, must "establish a horseracing anti-doping and medication control program." HISA § 1206(a)(1), 134 Stat. at 3263. This is a direct statutory command, and the Authority has no discretion to decline to establish an anti-doping and medication-control program. Regulations enforcing such a program are therefore certainly impending.

82.     HISA specifically directs the Authority to adopt a number of regulations that shall go into effect on July 1, 2022. HISA requires the Authority to issue, at least 120 days before July 1, 2022, national standards for "the administration of medication to covered horses" and "laboratory testing accreditation and protocols," as well as a "list of permitted and prohibited medications, substances, and methods, including allowable limits of permitted medications, substances, and methods." HISA §§ 1206(c)(1), 1208(b), 134 Stat. at 3264, 3270–71.

83.    The Authority must develop a process for reviewing the administration of medication to a covered horse within 48 hours before that horse's next scheduled racing start. HISA § 1206(c)(2), 134 Stat. at 3264.  The program generally prohibits the "administration of any prohibited or otherwise permitted substance to a covered horse within 48 hours of its next racing start." *Id.* § 1206(d), 134 Stat. at 3265.

84.    The Authority must also develop requirements concerning any agreement it enters into with its chosen anti-doping enforcement agency.  HISA § 1206(c)(3), 134 Stat. at 3264.  HISA requires the enforcement agency to recommend anti-doping and medication-control regulations to the Authority; conduct and oversee independent investigations; charge and adjudicate potential rule violations; enforce any civil sanctions; manage test distribution, sample collection, and testing; and accredit and monitor laboratories.  *Id.* § 1206(c)(4), 134 Stat. at 3264–65.  Any final decision or sanction of the anti-doping enforcement agency is considered the "final decision or civil sanction of the Authority."  *Id.* § 1206(c)(4)(B), 134 Stat. at 3265.

85.    HISA provides a set of baseline rules drawn from international anti-doping rules that will "constitute the initial rules of the horseracing anti-doping and medication control program." HISA § 1206(g)(1)–(2), 134 Stat. at 3266–67.  The Authority may submit modifications of these baseline rules to the Commission in the exercise of its regulatory powers, but the Authority cannot "approve any proposed modification that renders an anti-doping and medication control rule less stringent than the baseline [rules] . . . without the approval of the anti-doping and medication control enforcement agency." *Id.* § 1206(g)(3), 134 Stat. at 3267.

ii.    The Racetrack-Safety Program

86.    By July 1, 2022, the Authority, following the notice-and-comment procedures described above, must "establish a racetrack safety program."  HISA § 1207(a)(1), 134 Stat. at

3267.  Like the anti-doping and medication-control program, HISA imposes on the Authority a nondiscretionary duty to adopt a series of regulations to enforce the racetrack-safety program.  In developing this program, the Authority must consider existing national, foreign, and international safety standards.  *Id.* § 1207(a)(2), 134 Stat. at 3267–68.

87.     HISA requires the racetrack-safety program to include: (1) training and racing safety standards and protocols that account for regional differences and differences between racing facilities; (2) uniform training and racing safety standards "consistent with the humane treatment of covered horses"; (3) a "racing surface quality maintenance system"; (4) uniform "track safety standards"; (5) "[p]rograms for injury and fatality data analysis"; (6) investigations relating to safety violations; (7) "[p]rocedures for investigating, charging, and adjudicating violations and for the enforcement of civil sanctions for violations"; (8) "[a] schedule of civil sanctions for violations"; (9) "[d]isciplinary hearings"; (10) "[m]anagement of violation results"; (11) "[p]rograms relating to safety and performance research and education"; and (12) "[a]n evaluation and accreditation program that ensures that racetracks" meet the standards of the racetrack-safety program.  HISA § 1207(b), 134 Stat. at 3268.

88.     No less than 120 days before July 1, 2022, the Authority must issue a rule that establishes standards for the accreditation of racetracks under the racetrack-safety program.  HISA § 1207(c)(2), 134 Stat. at 3268–69.  Within one year after July 1, 2022, the Authority must issue a rule establishing a "nationwide database of racehorse safety, performance, health, and injury information" and "may require covered persons to collect and submit to the database . . . such information as the Authority may require to further the goal of increased racehorse welfare."  *Id.* § 1207(c)(3), 134 Stat. at 3269.

iii.      <u>Enforcement And Sanctions Authority</u>

89.    HISA requires the Authority to develop and issue (pursuant to the notice-and-comment process described above) uniform rules permitting (1) "access to offices, racetrack facilities, other places of business, books, records, and personal property of covered persons that are used in the care, treatment, training, and racing of covered horses"; (2) "issuance and enforcement of subpoenas and subpoenas duces tecum"; and (3) "other investigatory powers of the nature and scope exercised by State racing commissions before" July 1, 2022.  HISA § 1205(c)(1)(A), 134 Stat. at 3259.  The Authority may also "recommend that the Commission commence an enforcement action" concerning "an unfair or deceptive act or practice."  *Id.* § 1205(c)(1)(B), 134 Stat. at 3259.

90.    "As a condition of participating in covered races and in the care, ownership, treatment, and training of covered horses," HISA requires "a covered person" to "register with the Authority" pursuant to rules prepared by the Authority and approved by the Commission.  HISA § 1205(d)(1), 134 Stat. at 3259.  The registrant must agree "to be subject to and comply with" the enforcement rules the Authority adopts under Section 1205(c).  *Id.* § 1205(d)(2), 134 Stat. at 3259.

91.    HISA requires the Authority to issue, through the notice-and-comment process described above, a description of violations of "safety, performance, and anti-doping and medication control" rules.  HISA § 1208(a)(1), 134 Stat. at 3269.  HISA provides a lengthy list of the types of actions that the Authority may define as violations, including the detection of a prohibited substance in a sample, the use or attempted use of a prohibited substance or treatment method, the possession or attempted possession of a prohibited substance or method, the refusal "to submit a covered horse for sample collection," the failure to cooperate or respond truthfully to the Authority or its agent during an investigation, the tampering or attempted tampering with the

enforcement of the Authority's rules, covering up or helping to cover up a violation of the Authority's rules, and attempting to intimidate a person from reporting a violation of the Authority's rules.  *Id.* § 1208(a)(2), 134 Stat. at 3269–70.

92.     Any registered person must "cooperate with the Commission, the Authority, the anti-doping and medication control enforcement agency, and any respective designee, during any civil investigation" and must "respond truthfully and completely" to any question asked by "the Commission, the Authority, the anti-doping and medication control enforcement agency, or any respective designee."  HISA § 1205(d)(3), 134 Stat. at 3260.  HISA states that failure to cooperate is a civil violation.  *Id.* § 1205(d)(4), 134 Stat. at 3260.

93.     HISA grants the Authority "subpoena and investigatory authority with respect to civil violations committed under its jurisdiction" and requires it to "develop a list of civil penalties with respect to the enforcement of rules for covered persons and covered horseraces under its jurisdiction."  HISA § 1205(h)–(i), 134 Stat. at 3262.

94.     HISA does not grant any governmental entity, official, or employee the right to approve or disapprove the Authority's decision to issue a subpoena or exercise its investigatory authority.

95.     At least 120 days before July 1, 2022, the Authority must issue (through the notice-and-comment process) rules governing the disciplinary process for potential rule violations, including notification to the violator, hearing procedures, the burden of proof, presumptions, rules of evidence, appeals, and guidelines for the "confidentiality and public reporting of decisions."  HISA § 1208(c), 134 Stat. at 3271.

96.     HISA requires the Authority to "establish uniform rules, in accordance with section 1204, imposing civil sanctions" for violations of its rules; these sanctions may include "lifetime

bans from horseracing, disgorgement of purses, monetary fines and penalties, and changes to the order of finish in covered races."  HISA § 1208(d), 134 Stat. at 3271–72.

97.     A "person aggrieved by the civil sanction" may apply to the Commission for review of the sanction by an administrative law judge.  HISA § 1209(b), 134 Stat. at 3272.  The decision of the administrative law judge is to be the final decision of the Commission, unless the Commission exercises its discretion to review the decision of the administrative law judge.  *Id.* § 1209(b)(3)(B)–(c), 134 Stat. at 3273–74.

98.     In addition to these civil sanctions, HISA also permits the Authority to

commence a civil action against a covered person or racetrack that has engaged, is engaged, or is about to engage, in acts or practices constituting a violation[,] . . . to enjoin such acts or practices, to enforce any civil sanctions imposed . . . , and for all other relief to which the Authority may be entitled.

HISA § 1205(j)(1), 134 Stat. at 3262.

99.     The Authority would have no power to regulate the horseracing industry beyond voluntarily affiliated entities without HISA.  HISA gives the Authority's regulations preemptive force over contrary state law.  HISA § 1205(b), 134 Stat. at 3259.  Because the Constitution gives preemptive force to only federal law, *see* U.S. Const. art. VI, cl. 2, the Authority's regulations are binding on the states and the regulated industry only because HISA gives the Authority's regulations the force of federal law.  Without HISA, the Authority's rules would be merely precatory, and it would have no means of enforcing them.

100.     If the Authority's rules were not federal law, the Authority would have no power to sanction a member of the industry because it could ignore any attempts at discipline with impunity.  *See* HISA § 1208(d), 134 Stat. at 3271–72.  The Authority would have no right to sue to enforce a violation of its rules in federal court.  *See id.* § 1205(j), 134 Stat. at 3262.  The Authority would have no right to investigate a potential violation of its rules and would be deemed

a trespasser if it attempted to. *See id.* § 1205(c), (h), 134 Stat. at 3259, 3262. Finally, the Authority would have no ability to fund itself. It could not put a state to the choice of funding the Authority or losing its ability to collect taxes for similar regulatory activity. *See id.* § 1203(f)(3)(D), 134 Stat. at 3257. And the Authority would have no power to compel a member of the horseracing industry to fund its activities. *See id.* § 1203(f)(3)(C)(ii), 134 Stat. at 3257. Without the ability (granted by HISA) to invoke the full coercive power of the state to demand compliance with its rules, the Authority would be a toothless entity with the power to issue only recommendations.

## II.    HISA's Effects On Plaintiffs

### A.    The State Of Oklahoma And The OHRC

101.    HISA will harm the State of Oklahoma and the OHRC in numerous ways, including by unconstitutionally intruding on the State's sovereignty, which is protected by the Tenth Amendment of the United States Constitution.

102.    The OHRC is "charged by clear statutory mandate to design, create and maintain a racing program which is free of even a suggestion of corruption or dishonesty." *Okla. Park, Inc. v. Okla. Horse Racing Comm'n*, 716 P.2d 666, 667 (Okla. 1986). It is vested with "plenary power to promulgate rules and regulations for the forceful control of race meetings held in [Oklahoma]," including to "maintain race meetings held in [Oklahoma] of the highest quality and free of any horse racing practices which are corrupt, incompetent, dishonest, or unprincipled," to "dissipate any cloud of association with the undesirable and maintain the appearance as well as the fact of complete honesty and integrity of horse racing in [Oklahoma]," and to "generate public revenues." Okla. Stat. tit. 3A, § 203.7. As such, the OHRC bans many substances and treatments in horseracing, including the practice of doping, to protect the integrity of horseracing, to ensure the health of horses, and to safeguard the interests of the public and the racing participants. *See id.*

§ 208.11; *Okla. Park*, 716 P.2d at 667–68; *see also* Okla. Stat. tit. 3A, § 205.2(B); Okla. Admin. Code 325:35-1-5(a).

103.     HISA requires Oklahoma and the OHRC to cooperate and share information with the Authority; forces them to remit taxes and fees to fund the Authority or lose the ability to collect taxes and fees for their own anti-doping, medication-control, and racetrack-safety programs; and preempts some of Oklahoma's laws and regulations.

104.     HISA forces the state through the OHRC to assess, collect, and remit to the Authority fees that the Authority determines to be Oklahoma's proportional share of the Authority's annual budget for the next calendar year.  HISA § 1203(f)(2), 134 Stat. at 3256–57. The Board of Directors of the Authority, subject only to public comment, determines the annual budget of the Authority.  There is no appeal or allowable challenges of what the Authority ultimately approves as its budget.  If the State of Oklahoma refuses to assess, collect, and remit fees to the Authority, HISA strips from Oklahoma its right to "impose or collect from any person a fee or tax relating to anti-doping and medication control or racetrack safety matters for covered horseraces." *Id.* § 1203(f)(3), 134 Stat. at 3257.  So, for example, if Oklahoma were to decide that it desired that its anti-doping regulations be stricter than the Authority's regulations, HISA would bar Oklahoma from raising the funds necessary to enforce its own regulations unless it also agreed to collect the Authority's fees.  That ban on state legislation or regulation that imposes taxes and fees applies only to states that refuse to fund the Authority—not to states that give money to the Authority.  Furthermore, a portion of the amount of the statutorily designated taxes that the OHRC collects are used for these purposes, but it may not be feasible to separately calculate or remove those amounts from the existing taxes.

105.    HISA requires Oklahoma "law enforcement authorities" to "cooperate and share information" with the Authority whenever a person's conduct may violate both a rule of the Authority and Oklahoma law.  HISA § 1211(b), 134 Stat. at 3275.  HISA thus forces the State of Oklahoma to spend time and resources to help the Authority carry out a federal regulatory program. This mandate harms Oklahoma.

106.    Finally, even though Oklahoma has successfully regulated horseracing for decades through the OHRC, HISA preempts state laws and regulations on which Oklahomans and the regulated industry have long relied to ensure the safety and integrity of horseracing.  *See* HISA § 1205(b), 134 Stat. at 3259.  HISA purports to impose this preemption on Oklahoma via the regulations of a private corporation, which has a governing board that is neither appointed nor removable by a federal officer, and which can impose rules compliant with the Act and federal regulations without any meaningful oversight by politically accountable actors.

107.    HISA affirmatively requires the Authority to exercise regulatory authority over horseracing in Oklahoma and requires Oklahoma to assist the Authority and to choose between remitting funds to the Authority or losing some of its powers of taxation.  These harms are certainly impending.  And Oklahoma and the OHRC will be injured long before HISA's effective date of July 1, 2022.  They will have to take preparatory action long before that date to ensure that (1) they comply with the obligations HISA imposes on them and (2) they do not intrude on federal jurisdiction once HISA's rules become effective.

B.    **The State Of West Virginia And The WVRC**

108.    HISA will harm the State of West Virginia and the WVRC in several ways, including by unconstitutionally intruding on the State's sovereignty, which is protected by the Tenth Amendment of the United States Constitution.

109.    The WVRC has, pursuant to West Virginia Code Chapter 19, Article 23, issued extensive regulations governing Thoroughbred racing, including detailed regulation of "Equine Veterinary Practices, Health and Medication."  The WVRC also has certain enforcement duties and responsibilities with respect to the relevant laws and regulations of West Virginia related to Thoroughbred horse racing.  West Virginia Code § 19-23-10 levies, and the WVRC collects, taxes from licensed racing associations to fund the operations of the WVRC, including the efforts of the WVRC to issue regulations relevant to Equine Veterinary Practices, Health and Medication, and the enforcement thereof.

110.    HISA requires West Virginia and the WVRC to cooperate and share information with the Authority; forces them to remit taxes and fees to fund the Authority or lose the ability to collect taxes and fees for their own anti-doping, medication-control, and racetrack-safety programs; and preempts some of West Virginia's laws and regulations.

111.    HISA forces West Virginia and the WVRC to assess, collect, and remit to the Authority West Virginia's "share" of fees that the Authority determines necessary to fund the Authority's annual budget for the next calendar year.  HISA § 1203(f)(2), 134 Stat. at 3256–57. The Board of Directors of the Authority, subject only to public comment, determines the annual budget of the Authority.  There is no appeal or allowable challenges of what the Authority ultimately approves as its budget.  If the State of West Virginia does not pass a law to assess, collect, and remit the required fees to the Authority, HISA strips from West Virginia its right to "impose or collect from any person a fee or tax relating to anti-doping and medication control or racetrack safety matters for covered horseraces." *Id.* § 1203(f)(3), 134 Stat. at 3257.  A portion of the amount of the statutorily designated taxes that the WVRC collects are used for these purposes, but it is not feasible to separately calculate or remove those amounts from the existing taxes.

112.   HISA requires West Virginia "law enforcement authorities" to "cooperate and share information" with the Authority whenever a person's conduct may violate both a rule of the Authority and West Virginia law.  HISA § 1211(b), 134 Stat. at 3275.  HISA thus forces the State of West Virginia to spend time and resources to help the Authority carry out a federal regulatory program.  This mandate harms West Virginia.

113.   Finally, even though West Virginia has successfully regulated horseracing for decades through the WVRC, HISA preempts state laws and regulations on which West Virginians and the regulated industry have long relied to ensure the safety and integrity of horseracing, such as West Virginia's laws and regulations relating to "Equine Veterinary Practices, Health and Medication."  *See* HISA § 1205(b), 134 Stat. at 3259.  HISA purports to impose this preemption on West Virginia via the regulations of a private corporation, which has a governing board that is neither appointed nor removable by a federal officer, and which can impose rules compliant with the Act and federal regulations without any meaningful oversight by politically accountable actors.

114.   HISA affirmatively requires the Authority to exercise regulatory authority over horseracing in West Virginia and requires West Virginia to assist the Authority and to choose between remitting funds to the Authority or losing some of its powers of taxation.  These harms are certainly impending.  And West Virginia and the WVRC will be injured long before HISA's effective date of July 1, 2022.  They will have to take preparatory action long before that date to ensure that (1) they comply with the obligations HISA imposes on them and (2) they do not intrude on federal jurisdiction once HISA's rules become effective.

C.      **The State Of Louisiana**

115.    HISA harms the State of Louisiana and its people in several ways, including by unconstitutionally intruding on the State's sovereignty, which is protected by the Tenth Amendment of the United States Constitution.

116.    For decades, the State of Louisiana has exercised its police powers over the horseracing industry through the Louisiana State Racing Commission ("LSRC"). La. Stat. Ann. § 4:141 *et seq.* The State, through the Louisiana Legislature, has delegated significant regulatory authority to the LSRC, which includes the power to "make rules and regulations for the holding, conducting, and operating of all race tracks, race meets, and races held in Louisiana." *Id.* § 4:147(6); *see id.* § 4:148. The LSRC also possesses the power to enforce, through fines and other measures, violations of statutes and regulations governing the health and safety of horses and all other participants in the horseracing industry in Louisiana. *See id.* §§ 4:155, 4:160, 4:175. Additionally, the LSRC collects significant fees and taxes on behalf of the State as part of its duties. *See id.* §§ 4:161, 4:168.

117.    HISA requires Louisiana and its LSRC to cooperate and share information with the Authority; forces them to remit taxes and fees to fund the Authority or lose the ability to collect taxes and fees for their own anti-doping, medication-control, and racetrack-safety programs; and preempts many Louisiana laws and regulations.

118.    HISA also imposes on Louisiana the false option of either submitting to its plenary authority and collecting fees on its behalf or else being preempted from imposing the same fees and taxes it has imposed for years to regulate and support horseracing in Louisiana. HISA § 1203(f)(2)–(3), 134 Stat. at 3256–57. This false option and the monetary and sovereign punishments that stem from it harm Louisiana.

119.    HISA also mandates Louisiana "law enforcement authorities" to "cooperate and share information" with the Authority.  HISA § 1211(b), 134 Stat. at 3275.  HISA thus forces the State of Louisiana to devote substantial resources to helping the Authority carry out a federal program.  This mandate harms Louisiana.

120.    Finally, even though Louisiana has successfully regulated horseracing for decades, HISA preempts state laws and regulations on which the people of Louisiana and the regulated industry have long relied to ensure the safety and integrity of horseracing.  *See* HISA § 1205(b), 134 Stat. at 3259.  HISA purports to impose this preemption on Louisiana via the regulations of a private corporation, which has a governing board that is neither appointed nor removable by a federal officer, and which can impose rules compliant with the Act and federal regulations without any meaningful oversight by politically accountable actors.

121.    HISA affirmatively requires the Authority to exercise regulatory authority over horseracing in Louisiana and requires Louisiana to assist the Authority and to choose between remitting funds to the Authority or losing some of its powers of taxation.  These harms are certainly impending.  The LSRC also has devoted resources to preparing for the implementation of HISA, which injures the State and its People both by intruding on their sovereign capacity and by requiring them to spend time and money.

**D.    Hanover Shoe Farms, Inc.**

122.    Hanover Shoe Farms, Inc., is a horse farm in Hanover, Pennsylvania.  Hanover is a horse breeder that breeds Standardbred horses to compete in harness racing.  Harness racing is a type of horse racing in which horses race at one of two types of gaits: either a trot or a pace.  It is called "harness racing" because the horse is harnessed to a two-wheeled vehicle known as a "race

bike" that the horse pulls and in which a driver sits.  Hanover sells horses to buyers in numerous states throughout the country.

123.    HISA permits either a state's racing commission or a "breed governing organization" (a term that HISA does not define) to elect to include Standardbred horses within the scope of HISA.  HISA § 1205(l)(1), 134 Stat. at 3263.  If such an election occurs, Hanover will be a "breeder" of "covered horses" and thus a "covered person" subject to comprehensive regulation by the Authority.  *Id.* § 1202(6), 134 Stat. at 3252.

124.    HISA thus causes numerous harms to Hanover.  As an entity engaged in the "care" of "covered horses," Hanover is currently subject to the risk of future regulation, under which it would be required to register with the Authority; agree "to be subject to and comply with the rules, standards, and procedures" of the Authority regarding its enforcement power; and cooperate with the Commission, the Authority, and the anti-doping and medication-control enforcement agency. HISA § 1205(d), 134 Stat. at 3259–60.  Hanover would have to comply with all applicable rules of the Authority issued as part of its anti-doping and medication-control program and its racetrack-safety program or risk incurring a civil sanction from the Authority or the anti-doping enforcement agency.  *Id.* § 1208(a), 134 Stat. at 3269–70.   Hanover would be subject to inspections, investigations, subpoenas, and even lawsuits by the Authority in the exercise of its enforcement authority.  *Id.* § 1205(c), (h)–(j), 134 Stat. at 3259, 3262.  Given the wide scope of conduct that regulations enacted under HISA are likely to prohibit and Hanover's past, current, and intended future involvement in raising Standardbred racehorses, Hanover faces a "credible threat of enforcement" action against it.  *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161–67 (2014).  Moreover, when a person "is himself an object of [governmental] action," "there is ordinarily little question that the action . . . has caused him injury."  *Lujan v. Defs. of Wildlife*, 504

U.S. 555, 561–62 (1992).  Hanover will also be required to contribute whatever costs the Authority decides to apportion to it to fund these regulations and enforcement actions.  HISA § 1205(l)(3), 134 Stat. at 3263.

### E.   United States Trotting Association

125.   The United States Trotting Association is a nonprofit organization headquartered in Columbus, Ohio.  It is an association of Standardbred horse owners, breeders, drivers, trainers, and officials.  It creates the rules of harness racing, licenses persons involved in harness racing, serves as the registry for Standardbred horses, works to ensure the integrity of harness racing, and ensures the humane treatment of Standardbred horses.  Before state racing commissions began to regulate harness racing in the 1960s, the USTA was the sole regulatory body for harness racing.  In order for a Standardbred horse to be eligible to race in North America, that horse must be registered with the USTA.  And for a driver or trainer to qualify for a license from the state racing commission, he must first pass written and practical examinations administered by the USTA.

126.   Because the USTA is an association of Standardbred owners, breeders, drivers, trainers, and officials, it is well-suited to defend the interests of its members.

> [A]n association has standing to bring suit on behalf its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  The USTA's members have standing in their own right:  They face a credible threat of regulation and enforcement action under HISA given the high likelihood that at least one state racing commission will elect to have HISA cover Standardbred racehorses in that state.  HISA § 1205(l)(1), 134 Stat. at 3263; *see Susan B. Anthony List*, 573 U.S. at 161–67.  The interests that the USTA seeks to protect are germane to the organization's purpose as the self-regulatory body for Standardbred racehorses.  And

34

participation by individual members is not required because the USTA is seeking a declaration that HISA is facially unconstitutional, as well as an injunction preventing its enforcement.

### F.    Oklahoma Quarter Horse Racing Association

127.    The Oklahoma Quarter Horse Racing Association is a nonprofit association headquartered in Edmond, Oklahoma.  Its membership predominantly consists of people affiliated with racing sprint-breed horses, including owners, breeders, drivers, trainers, and officials.  The OQHRA's members participate in races both in Oklahoma and throughout the rest of the United States.

128.    The OQHRA is the official representative of all sprint breeds that participate in a race in Oklahoma.  Okla. Stat. tit. 3A, § 267.  As the recognized Horsemen's Organization for sprint breeds in Oklahoma, the OQHRA has the exclusive authority to contract with licensed racetracks regarding the terms and conditions of races involving sprint breeds in Oklahoma.  *See* Okla. Admin. Code § 325:35-1-34.

129.    Because the OQHRA is an association that includes sprint-breed owners, breeders, drivers, trainers, and officials, it is well-suited to defend the interests of its members.

> [A]n association has standing to bring suit on behalf its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt*, 432 U.S. at 343.  The OQHRA's members have standing in their own right:  They face a credible threat of regulation and enforcement action under HISA given the high likelihood that at least one state racing commission will elect to have HISA cover Quarter Horse racehorses in that state.  HISA § 1205(l)(1), 134 Stat. at 3263; *see Susan B. Anthony List*, 573 U.S. at 161–67.  The interests that the OQHRA seeks to protect are germane to the organization's purpose as a self-regulatory body for Quarter Horse racehorses.  And participation by individual members is not

required because the OQHRA is seeking a declaration that HISA is facially unconstitutional, as well as an injunction preventing its enforcement.

### G.     Fair Meadows

130.     Tulsa County Public Facilities Authority, an Oklahoma public trust, d/b/a Fair Meadows Racing and Sports Bar, is an entity that conducts horse races in Tulsa, Oklahoma.  Fair Meadows has been licensed by the Oklahoma Horse Racing Commission to conduct horse races since 1990.  It conducts races that involve Thoroughbreds, Quarter Horses, Paints, and Appaloosas.

131.     Because Fair Meadows is an organization licensed to conduct "covered horseraces" of Thoroughbred horses, it is a "racetrack" engaged in the racing of "covered horses" and thus a "covered person" subject to comprehensive regulation by the Authority.  HISA § 1202(4), (6), (15), 134 Stat. at 3252–53.

132.     HISA thus causes numerous harms to Fair Meadows.  As a "racetrack" engaged in "covered horseraces" of "covered horses," Fair Meadows will certainly be subject to regulation, under which it will be required to register with the Authority; agree "to be subject to and comply with the rules, standards, and procedures" of the Authority regarding its enforcement power; and cooperate with the Commission, the Authority, and the anti-doping and medication-control enforcement agency.  HISA § 1205(d), 134 Stat. at 3259–60.  Fair Meadows would have to comply with all applicable rules of the Authority issued as part of its anti-doping and medication-control program and its racetrack-safety program or risk incurring a civil sanction from the Authority or the anti-doping enforcement agency.  *Id.* § 1208(a), 134 Stat. at 3269–70.  Fair Meadows would also have to seek accreditation from the Authority in order to continue conducting Thoroughbred horse races.  *Id.* § 1207(b)–(c), 134 Stat. at 3268–69.  Fair Meadows would be subject to inspections, investigations, subpoenas, and even lawsuits by the Authority in the exercise of its

enforcement authority.  *Id.* § 1205(c), (h)–(j), 134 Stat. at 3259, 3262.  Given the wide scope of conduct that regulations enacted under HISA are likely to prohibit and Fair Meadows' past, current, and intended future involvement in conducting Thoroughbred horse races, Fair Meadows faces a "credible threat of enforcement" action against it.  *See Susan B. Anthony List*, 573 U.S. at 161–67.  Moreover, when a person "is himself an object of [governmental] action," "there is ordinarily little question that the action . . . has caused him injury."  *Lujan*, 504 U.S. at 561–62.  Because Fair Meadows conducts "covered horseraces," it will also be required to contribute whatever costs the Authority decides to apportion to it to fund these regulations and enforcement actions.  HISA § 1203(f)(3), 134 Stat. at 3257.

133.    HISA affirmatively requires the Authority to exercise regulatory authority over Fair Meadows's Thoroughbred horseracing and requires Fair Meadows to fund the Authority, so its injuries are certainly impending.  And Fair Meadows will be injured long before HISA's effective date of July 1, 2022.  It will have to take preparatory action long before that date to ensure that it is in compliance when the Authority's regulations go into effect to avoid potential sanctions or a lawsuit.

### H.    Remington Park

134.    Global Gaming RP, LLC, is an Oklahoma limited-liability company that leases and operates the Remington Park casino and racetrack near Oklahoma City, Oklahoma.  Global Gaming RP, LLC, does business as Remington Park.  Through various owners, Remington Park has been licensed by the Oklahoma Horse Racing Commission to conduct horse races since 1988.  It conducts races that involve Thoroughbreds and conducts mixed-breed races for Quarter Horses, Paints, and Appaloosas.

135.    Because Remington Park is an organization licensed to conduct "covered horseraces" of Thoroughbred horses, it is a "racetrack" engaged in the racing of "covered horses" and thus a "covered person" subject to comprehensive regulation by the Authority.   HISA § 1202(4), (6), (15), 134 Stat. at 3252–53.

136.    HISA thus causes numerous harms to Remington Park.  As a "racetrack" engaged in "covered horseraces" of "covered horses," Remington Park will be subject to regulation, under which it will be required to register with the Authority; agree "to be subject to and comply with the rules, standards, and procedures" of the Authority regarding its enforcement power; and cooperate with the Commission, the Authority, and the anti-doping and medication-control enforcement agency.  HISA § 1205(d), 134 Stat. at 3259–60.  Remington Park would have to comply with all applicable rules of the Authority issued as part of its anti-doping and medication-control program and its racetrack-safety program or risk incurring a civil sanction from the Authority or the anti-doping enforcement agency.  *Id.* § 1208(a), 134 Stat. at 3269–70.  Remington Park would also have to seek accreditation from the Authority in order to continue conducting Thoroughbred horse races.  *Id.* § 1207(b)–(c), 134 Stat. at 3268–69.  Remington Park would be subject to inspections, investigations, subpoenas, and even lawsuits by the Authority in the exercise of its enforcement authority.  *Id.* § 1205(c), (h)–(j), 134 Stat. at 3259, 3262.  Given the wide scope of conduct that regulations enacted under HISA are likely to prohibit and Remington Park's past, current, and intended future involvement in conducting Thoroughbred horse races, Remington Park faces a "credible threat of enforcement" action against it.  *See Susan B. Anthony List*, 573 U.S. at 161–67.  Moreover, when a person "is himself an object of [governmental] action," "there is ordinarily little question that the action . . . has caused him injury."  *Lujan*, 504 U.S. at 561–62.  Because Remington Park conducts "covered horseraces," it will also be required

to contribute whatever costs the Authority decides to apportion to it to fund these regulations and enforcement actions.  HISA § 1203(f)(3), 134 Stat. at 3257.

137.    HISA affirmatively requires the Authority to exercise regulatory authority over Remington Park's Thoroughbred horseracing and requires Remington Park to fund the Authority, so its injuries are certainly impending.  And Remington Park will be injured long before HISA's effective date of July 1, 2022.  It will have to take preparatory action long before that date to ensure that it is in compliance when the Authority's regulations go into effect to avoid potential sanctions or a lawsuit.

## I.    Will Rogers Downs

138.    Will Rogers Downs LLC is an Oklahoma limited-liability company that operates the Will Rogers Downs racetrack near Tulsa, Oklahoma.  Will Rogers Downs has been licensed by the Oklahoma Horse Racing Commission to conduct horse races since 2006.  It conducts races that involve Thoroughbreds and conducts mixed-breed races for Quarter Horses, Paints, and Appaloosas.

139.    Because Will Rogers Downs is an organization licensed to conduct "covered horseraces" of Thoroughbred horses, it is a "racetrack" engaged in the racing of "covered horses" and thus a "covered person" subject to comprehensive regulation by the Authority.   HISA § 1202(4), (6), (15), 134 Stat. at 3252–53.

140.    HISA thus causes numerous harms to Will Rogers Downs.  As a "racetrack" engaged in "covered horseraces" of "covered horses," Will Rogers Downs will be subject to regulation, under which it will be required to register with the Authority; agree "to be subject to and comply with the rules, standards, and procedures" of the Authority regarding its enforcement power; and cooperate with the Commission, the Authority, and the anti-doping and medication-

control enforcement agency.  HISA § 1205(d), 134 Stat. at 3259–60.  Will Rogers Downs would have to comply with all applicable rules of the Authority issued as part of its anti-doping and medication-control program and its racetrack-safety program or risk incurring a civil sanction from the Authority or the anti-doping enforcement agency.  *Id.* § 1208(a), 134 Stat. at 3269–70.  Will Rogers Downs would also have to seek accreditation from the Authority in order to continue conducting Thoroughbred horse races.  *Id.* § 1207(b)–(c), 134 Stat. at 3268–69.  Will Rogers Downs would be subject to inspections, investigations, subpoenas, and even lawsuits by the Authority in the exercise of its enforcement authority.  *Id.* § 1205(c), (h)–(j), 134 Stat. at 3259, 3262.  Given the wide scope of conduct that regulations enacted under HISA are likely to prohibit and Will Rogers Downs' past, current, and intended future involvement in conducting Thoroughbred horse races, Will Rogers Downs faces a "credible threat of enforcement" action against it.  *See Susan B. Anthony List*, 573 U.S. at 161–67.  Moreover, when a person "is himself an object of [governmental] action," "there is ordinarily little question that the action . . . has caused him injury."  *Lujan*, 504 U.S. at 561–62.  Because Will Rogers Downs conducts "covered horseraces," it will also be required to contribute whatever costs the Authority decides to apportion to it to fund these regulations and enforcement actions.  HISA § 1203(f)(3), 134 Stat. at 3257.

141.    HISA affirmatively requires the Authority to exercise regulatory authority over Will Rogers Downs's Thoroughbred horseracing and requires Will Rogers Downs to fund the Authority, so its injuries are certainly impending.  And Will Rogers Downs will be injured long before HISA's effective date of July 1, 2022.  It will have to take preparatory action long before that date to ensure that it is in compliance when the Authority's regulations go into effect to avoid potential sanctions or a lawsuit.

## COUNT ONE:

### Violation Of The U.S. Constitution (Private Non-Delegation Doctrine)

142. All preceding paragraphs are incorporated by reference.

143. The U.S. Constitution vests all legislative power in Congress and all executive power in the President. U.S. Const. art. I, § 1, cl. 1; *id.* art. II, § 1, cl. 1.

144. Congressional delegation of regulatory authority to "private persons" is "legislative delegation in its most obnoxious form." *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936). Accordingly, while Congress may delegate regulatory authority to other branches in certain circumstances, "[f]ederal lawmakers cannot delegate regulatory authority to a private entity" at all. *Ass'n of Am. R.R.s. v. U.S. Dep't of Transp.*, 721 F.3d 666, 670 (D.C. Cir. 2013), *vacated and remanded on other grounds sub nom. Dep't of Transp. v. Ass'n of Am. R.R.s.*, 575 U.S. 43 (2015).

145. A private entity may aid a governmental agency if that agency retains full discretion to approve, disapprove, and modify the private entity's proposals. *See Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940). If Congress makes a private entity part of a governmental regulatory program, the "amount of government oversight of the program" must be "considerable." *United States v. Frame*, 885 F.2d 1119, 1128 (3d Cir. 1989), *abrogated on other grounds by Glickman v. Wileman Bros. & Elliott*, 521 U.S. 457 (1997). "Congress may employ private entities for *ministerial* or *advisory* roles, but it may not give these entities governmental power over others." *Pittston Co. v. United States*, 368 F.3d 385, 395 (4th Cir. 2004).

146. The Authority is a "private, independent, self-regulatory, nonprofit corporation." HISA § 1203(a), 134 Stat. at 3253.

147. Congress has unconstitutionally delegated to this private entity significant regulatory authority. HISA permits the Authority to "develop[] and implement[] a horseracing anti-doping and medication control program and a racetrack safety program." HISA § 1203(a),

134 Stat. at 3253.  HISA permits the Authority to create federal regulations such as those governing prohibited substances and methods for treating horses, standards for laboratory accreditation and testing, rules for racetrack safety, definitions of violations of the Authority's rules, and the applicable civil sanctions for violations of its rules—all with preemptive force on state laws and regulations.  *Id.* § 1204(a), 134 Stat. at 3257–58.  While HISA requires the Authority to submit any of these proposed rules to the Commission, the Commission *must* publish them in the Federal Register for notice and comment, and the Commission *must* approve and issue a proposed rule if it is consistent with HISA and previous rules approved by the Commission.  *Id.* § 1204(b)–(c), 134 Stat. at 3258.  And for some rules, HISA does not make clear precisely what role (if any) the Commission must play before the Authority's proposed rules become effective.  *Id.* § 1204(d), 134 Stat. at 3258.  The Commission has no authority to draft, revise, or modify the rules under HISA in any way; it may issue only those rules prepared by the Authority.

148.    Under HISA's framework, the Commission is relegated to an advisory and ministerial role, and the Authority, a private entity, is empowered to deploy the full force of the state with only the thinnest veneer of governmental oversight.  HISA's delegation of rulemaking power to the Authority is thus an unconstitutional delegation of legislative power to a private entity.

149.    HISA also permits the Authority to "access . . . offices, racetrack facilities, other places of business, books, records, and personal property of covered persons"; to issue and enforce "subpoenas and subpoenas duces tecum"; and to exercise "other investigatory powers of the nature and scope exercised by State racing commissions."  HISA § 1205(c)(1)(A), 134 Stat. at 3259.  The Authority's decision to exercise its investigative powers against a particular regulated party is subject to *no* governmental oversight *at all*.  Congress has empowered a private entity to use the

42

full enforcement power of the government with absolutely no governmental supervision (unless the Authority decides to impose sanctions, at which point the government's review is limited to that decision to impose sanctions). Such a delegation of governmental authority to a private entity is an unconstitutional delegation of legislative power.

150.    HISA also permits the Authority to "commence a civil action" against a person for a violation of HISA or any rule promulgated by the Authority, also without any oversight by any governmental entity. HISA § 1205(j)(1), 134 Stat. at 3262. "[C]onducting civil litigation in the courts of the United States for vindicating public rights" is a "function[]" that "may be discharged only by persons who are 'Officers of the United States.'" *Buckley v. Valeo*, 424 U.S. 1, 140 (1976) (per curiam). "[W]hen an actor is endowed with law enforcement powers beyond those enjoyed by private citizens," that actor is exercising a "uniquely public function." *United States v. Ackerman*, 831 F.3d 1292, 1295–96 (10th Cir. 2016) (Gorsuch, J.) (emphasis omitted). The delegation of authority to commence enforcement actions for violations of federal regulations absent any governmental oversight is also an unconstitutional delegation of regulatory authority to a private entity.

151.    HISA additionally empowers the Authority to "determine and provide to each State racing commission the estimated amount required from the State" for "the State's proportionate share of the horseracing anti-doping and medication control program and the racetrack safety program for the next calendar year" and "to liquidate the State's proportionate share of any loan or funding shortfall in the current calendar year and any previous calendar year." HISA § 1203(f)(1)(C)(i), 134 Stat. at 3255–56. This private delegation of authority not only to collect fees, but also to set the amounts due, impermissibly exceeds what the Constitution permits and the limited arrangements that some courts have approved in the past. *See Pittston*, 368 F.3d at 395

(addressing scheme where private entity collects premiums but "has no power to determine the premium payments owed by each coal operator" as separately determined by the government); *Frame*, 885 F.2d at 1123–24 (scheme allowing private "collection of assessments" that the government separately determined); *cf. Adkins*, 310 U.S. at 399 (distinguishing a scheme in which the government, "not the [private entity], determines the prices" in the market at issue and thus "lawmaking is not entrusted to the industry").

152.    Further, if a state racing commission elects not to remit fees to the Authority, the Authority shall "allocate equitably the amount calculated . . . among covered persons involved with covered horseraces pursuant to such rules as the Authority may promulgate," and the Authority will directly collect fees from the covered persons, who "shall be required to remit such fees to the Authority."  HISA § 1203(f)(3)(B)–(C), 134 Stat. at 3257.  By empowering the Authority to collect fees and requiring members of the horseracing industry to comply, HISA thus unlawfully delegates to a private entity the uniquely governmental power of taxation.

153.    HISA also empowers an "anti-doping and medication control enforcement agency" to conduct "independent investigations, charg[e] and adjudicat[e] . . . potential medication control rule violations, and . . . enforce[] . . . any civil sanctions for such violations."  HISA § 1206(c)(4)(B), 134 Stat. at 3265.  And HISA empowers this anti-doping enforcement agency to manage the testing protocol under the Act and to accredit testing laboratories.  *Id.* § 1206(c)(4)(C)–(D), 134 Stat. at 3265.  HISA defines the anti-doping enforcement agency as some indeterminate private entity (preferentially, but not necessarily, the United States Anti-Doping Agency) that the Authority will contract with to enforce the horseracing anti-doping and medication-control program on the Authority's behalf.  *Id.* § 1205(e)(1), 134 Stat. at 3260.  Any final decision or sanction of the anti-doping enforcement agency is considered the "final decision or civil sanction

of the Authority." *Id.* § 1206(c)(4)(B), 134 Stat. at 3265.  And the Authority lacks complete discretion over the anti-doping enforcement agency because it cannot approve certain modifications to the anti-doping and medication-control rules without the approval of the anti-doping and medication-control enforcement agency.  *See id.* § 1206(g)(3)(C), 134 Stat. at 3267. The delegation of regulatory authority to the anti-doping enforcement agency thus presents an even more glaring constitutional violation.  HISA unconstitutionally delegates regulatory power to the Authority, a private entity, and then instructs the Authority to further delegate some of that power to *yet another private entity*, the anti-doping enforcement agency.  Such a regulatory structure is antithetical to the system of government established by the U.S. Constitution.

## COUNT TWO:

### Violation Of The U.S. Constitution (Non-Delegation Doctrine)

154.    All preceding paragraphs are incorporated by reference.

155.    The U.S. Constitution declares:  "All legislative powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."  U.S. Const. art. I, § 1.  Implicit in that exclusive "assignment of power to Congress is a bar on its further delegation." *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (plurality).  The Constitution thus prohibits Congress from transferring "to another branch 'powers which are strictly and exclusively legislative.'" *Id.* (quoting *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42 (1825)).  This rule is "mandate[d]" by "the integrity and maintenance of the system of government ordained by the Constitution." *Mistretta v. United States*, 488 U.S. 361, 371–72 (1989) (quoting *Field v. Clark*, 143 U.S. 649, 692 (1892)).

156.    In the past, the Supreme Court has held that whenever Congress grants another branch decision-making authority, it must "lay down by legislative act an intelligible principle to

which the person or body authorized to exercise the delegated authority is directed to conform." *Mistretta*, 488 U.S. at 372 (alteration omitted) (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406 (1928)).  A Congressional grant of decision-making authority without such an intelligible principle to guide the exercise of the conferred discretion is a constitutionally "forbidden delegation of legislative power." *Id.* (quoting *J.W. Hampton*, 276 U.S. at 409).[2]

157.    In HISA, Congress decided to regulate "any Thoroughbred horse" engaged in horseraces.  HISA § 1202(4), 134 Stat. at 3252.

158.    But Congress also empowered other entities to expand HISA's regulatory scope: "A State racing commission or a breed governing organization for a breed of horses other than Thoroughbred horses may elect to have such breed be covered by this Act by the filing of a designated election form and subsequent approval by the Authority."  HISA § 1205(l)(1), 134 Stat. at 3263.

159.    Whether HISA's regulations apply to any breeds other than Thoroughbred horses depends entirely on the decision of a state racing commission or a breed-governing organization to file an election form and on the decision of the Authority to approve that election.  Congress has thus delegated to state racing commissions, breed-governing organizations, and the Authority the power to determine whether HISA's regulatory sweep includes any breeds other than Thoroughbred horses.  These entities have the sole discretion of determining whether "all trainers, owners, breeders, jockeys, racetracks, veterinarians, persons (legal and natural) licensed by a State racing commission and the agents, assigns, and employees of such persons and other horse support

---

[2] Recognizing that the precedent cited binds this Court, Plaintiffs reserve the right to seek from the Supreme Court reconsideration of this "intelligible principle" standard and to argue that the precedent creating this standard should be overturned.  *See Gundy*, 139 S. Ct. at 2130–31 (Alito, J., concurring in the judgment).

personnel who are engaged in the care, training, or racing of" non-Thoroughbred horses are subject to regulation under HISA.  HISA § 1202(6), 134 Stat. at 3252.

160.   Congress has not supplied any intelligible principle to which the state racing commissions or breed-governing organizations must conform in electing to have a non-Thoroughbred breed included within the scope of HISA, stating only that they "*may elect* to have such breed be covered."  HISA § 1205(l)(1), 134 Stat. at 3263 (emphasis added).

161.   Nor has Congress supplied any intelligible principle to which the Authority must conform in deciding whether to give its "approval" of an election to subject a non-Thoroughbred breed to regulation under HISA.  HISA § 1205(l)(1), 134 Stat. at 3263.

162.   By delegating the authority to decide whether HISA regulates large swaths of the horseracing industry without any intelligible principle, HISA unconstitutionally delegates Congress's legislative power to state racing commissions, breed-governing organizations, and the Authority.

## COUNT THREE:

**Violation Of The U.S. Constitution & Tenth Amendment**
**(Commandeering Of State Legislative And Executive Branches)**

163.   All preceding paragraphs are incorporated by reference.

164.   "The Constitution confers on Congress not plenary legislative power but only certain enumerated powers," as "the Tenth Amendment confirms."  *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1476 (2018).  Absent from Congress's list of powers "is the power to issue direct orders to the governments of the States," a constitutional limitation known as the "anticommandeering doctrine."  *Id.*  Congress may not "command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program."  *Printz v. United States*, 521 U.S. 898, 935 (1997).  The "States are not mere political subdivisions of the

United States," and our Constitution requires Congress to "exercise its legislative authority directly over individuals rather than over States." *New York v. United States*, 505 U.S. 144, 165, 188 (1992).

165.    "[T]he anticommandeering principle prevents Congress from shifting the costs of regulation to the States." *Murphy*, 138 S. Ct. at 1477.  HISA requires states (via their state racing commissions) to remit state monies to fund the Authority's operations and to pay off the Authority's private loans authorized by the Act.  If a state refuses to do so, HISA further commandeers state legislative and executive authorities by prohibiting the state from imposing or collecting certain taxes or fees.  In other words, Congress has either (1) unconstitutionally shifted the costs of a federal regulatory program to the states or (2) commanded state legislators and officers not to impose or collect specific taxes or fees.

166.    HISA also violates this constitutional principle by requiring "State law enforcement authorities" to "cooperate and share information" with the Authority whenever a person's conduct may violate both state law and the rules of the Authority.  HISA § 1211(b), 134 Stat. at 3275.  By requiring state law enforcement to cooperate with the Authority, HISA unconstitutionally conscripts the state governments into helping the Authority carry out a federal regulatory program. If Congress wants to regulate, "it must appropriate the funds needed to administer the program," and it must enforce it.  *Murphy*, 138 S. Ct. at 1477.  Congress has no constitutional authority to command the law-enforcement agencies of the several states to help the Authority administer a federal regulatory program.

## <u>COUNT FOUR:</u>

### **Violation Of The U.S. Constitution's Fifth Amendment (Due Process)**

167.    All preceding paragraphs are incorporated by reference.

168.    The Due Process Clause of the Fifth Amendment of the Constitution provides: "No person shall . . . be deprived of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. V.

169.    Implicit in the concept of due process is the rule that a decision-maker may not exercise regulatory authority over matters in which he is self-interested. "[O]ne person may not be entrusted with the power to regulate the business of another, and especially of a competitor." *Carter*, 298 U.S. at 311. Such a "delegation is so clearly arbitrary, and so clearly a denial of rights safeguarded by the due process clause of the Fifth Amendment." *Id.* Due process therefore requires that a regulatory decision-maker be "presumptively disinterested." *Id.* An "economically self-interested actor" may not "regulate its competitors." *Ass'n of Am. R.R.s. v. Dep't of Transp.*, 821 F.3d 19, 23 (D.C. Cir. 2016).

170.    The Authority is empowered to regulate the horseracing industry and is composed of self-interested actors. Of the nine members on the Authority's Board of Directors, only a bare majority of five are required to be nominally "independent members selected from outside the equine industry." HISA § 1203(b)(1)(A), 134 Stat. at 3253. The other four board members *must* be self-interested actors—specifically, "industry members selected from among the various equine constituencies." *Id.* § 1203(b)(1)(B), 134 Stat. at 3253–54. A minority of members on the anti-doping and medication-control standing committee and the racetrack-safety standing committee must also be "industry members selected to represent the various equine constituencies." *Id.* § 1203(c)(1)(B)(ii), (2)(B)(ii), 134 Stat. at 3254–55. HISA thus gives self-interested economic actors from the equine industry the power to regulate their competitors in violation of the Due Process Clause.

49

171.     HISA's conflicts-of-interest provision does not alleviate this constitutional violation.  It purports to prohibit individuals with a commercial interest in the equine industry from serving on the Authority's Board of Directors or as independent members of a nominating or standing committee.  HISA § 1203(e), 134 Stat. at 3255.

172.     First, it is impossible to see how this provision, as applied to members of the Board, is consistent with the requirement that "[f]our members of the Board shall be industry members selected from among the various equine constituencies," HISA § 1203(b)(1)(B)(i), 134 Stat. at 3254, where HISA defines "equine constituencies" as "owners, breeders, trainers, racetracks, veterinarians, State racing commissions, and jockeys who are engaged in the care, training, or racing of covered horses," *id.* § 1202(7), 134 Stat. at 3252.  The conflict-of-interest provision purports to require that no member of the Board may have an interest in the equine industry, but HISA explicitly requires four members of the Board to have just such an interest.

173.     Further, the conflict-of-interest rule does not prohibit other ways in which self-interested actors may direct the regulatory decision-making of the Authority.  It does not prohibit a member of a sports industry that is in competition with the horseracing industry from serving on the Board or any committee.  HISA prohibits "equine industry representatives" from serving as independent members of the Board or a committee, HISA § 1203(e)(2)–(3), 134 Stat. at 3255, but it defines "equine industry representative" as "an organization regularly and significantly engaged in the equine industry," *id.* § 1202(8), 134 Stat. at 3252.  So a person engaged in the equine industry may serve as an independent member of the Board or a committee so long as he is not "regularly and significantly engaged."  The conflicts-of-interest rule also does not apply to the employees of the Authority or to the anti-doping enforcement agency, persons who will be tasked with carrying out the regulations adopted by the Authority.

174.     These concerns are not hypothetical.  As explained above, *see supra* ¶¶ 59–64, at least six members of the Board have connections to the horseracing industry or are in competition with that industry.  It is eminently foreseeable that those Board members will conduct the activities of the Authority in a manner that favors the entities they have allegiance to, likely at the expense of dissenting members of the horseracing industry.

175.     Because HISA empowers self-interested economic actors to regulate their competitors, its regulatory structure violates the Due Process Clause of the Fifth Amendment.

## COUNT FIVE:

### Violation Of U.S. Const. Art. II, § 2, Cl. 2 (Unlawful Appointments)

176.     All preceding paragraphs are incorporated by reference.

177.     The Authority is purportedly a private entity, but if this Court nonetheless classifies it as a governmental entity, its structure would still violate the Constitution.  *See* Fed. R. Civ. P. 8(d)(2) (permitting alternative claims).

178.     The Constitution gives the President the power to

nominate, and by and with the advice and consent of the Senate, . . . appoint . . . officers of the United States, whose appointments are not herein otherwise provided for, and which shall be established by law: but the Congress may by law vest the appointment of such inferior officers, as they think proper, in the President alone, in the courts of law, or in the heads of departments.

U.S. Const. art. II, § 2, cl. 2.  Thus, an inferior officer may be appointed by the President, a court, or a department head.  A principal officer, in contrast, must be nominated by the President and confirmed by the Senate.

179.     A person is an officer if he "occup[ies] a 'continuing' position established by law" and "exercis[es] significant authority pursuant to the laws of the United States."  *Lucia v. SEC*, 138 S. Ct. 2044, 2051 (2018) (internal quotation marks omitted).

180.    If the Authority is considered a governmental entity, then the members of its Board of Directors are officers of the United States.  First, HISA establishes the Board of Directors and its members, HISA § 1203(b), 134 Stat. at 3253–54, and directs the Board to promulgate bylaws establishing term limits for its members, *id.* §§ 1203(b)(3), 1204(a)(1), 134 Stat. at 3254, 3257. The members of the Board thus occupy continuing positions established by law.  Second, because the Board has the authority to promulgate regulations (including regulations that preempt state law), issue and enforce subpoenas, impose sanctions up to and including lifetime bans from horseracing, and bring civil actions in federal court to enforce the Authority's rules and sanctions, the members of the Board exercise significant authority pursuant to the laws of the United States.

181.    As officers of the United States, the Appointments Clause requires that the Authority's Board of Directors be appointed by the President, a court, or a department head if they are inferior officers and to be nominated by the President and confirmed by the Senate if they are principal officers.

182.    The appointment of members of the Authority's Board of Directors does not follow either procedure.  The initial composition of the Board of Directors is selected by a nominating committee, and the initial composition of that nominating committee is "set forth in the governing corporate documents of the Authority."  HISA § 1203(d)(1), 134 Stat. at 3255.  Thereafter, the "procedures for filling vacancies on the Board" are to be set out in the bylaws promulgated by the Board.  *Id.* § 1203(b)(3)(C), 134 Stat. at 3254.  This method of appointing the members of the Authority's Board of Directors violates the Appointments Clause.

## COUNT SIX:

### Violation Of The U.S. Constitution (Article II And Separation Of Powers)

183.    All preceding paragraphs are incorporated by reference.

184.    The Constitution states that "[t]he executive power shall be vested in a President of the United States of America," U.S. Const. art. II, § 1, cl. 1, who "shall take care that the laws be faithfully executed," *id.* art. II, § 3.

185.    Because the Constitution vests all executive power in the President, "lesser officers must remain accountable to the President, whose authority they wield." *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2197 (2020).  Accordingly, the President's executive power "generally includes the ability to remove executive officials, for it is 'only the authority that can remove' such officials that they 'must fear and, in the performance of [their] functions, obey.'" *Id.* (quoting *Bowsher v. Synar*, 478 U.S. 714, 726 (1986)).

186.    There are two exceptions in which Congress may limit the President's removal power by permitting the President to remove an Executive Branch employee only for good cause: "one for multimember expert agencies that do not wield substantial executive power, and one for inferior officers with limited duties and no policymaking or administrative authority." *Seila Law*, 140 S. Ct. at 2199–2200.  While the President's removal authority may be limited in these two circumstances, his removal authority over a person exercising federal executive authority can never be eliminated entirely.  To do so would be to make that person entirely unaccountable to the President and thus divest the President of some of his constitutionally exclusive executive power.

187.    If the Authority were considered to be a governmental entity, its structure would violate Article II of the Constitution.  HISA gives the Authority the power to exercise executive power:  It can promulgate regulations, conduct investigations, issue subpoenas, impose sanctions, and commence civil actions for violations of its rules.  But the Authority is completely independent of the President.  The members of the Authority's Board of Directors cannot be removed by the President—or indeed by any other federal employee—*at all*.  Instead, HISA instructs the Authority

itself to create the rules for termination of its board members in the bylaws it promulgates.  HISA §§ 1203(b)(3)(D), 1204(a)(1), 134 Stat. at 3254, 3257.  By creating such an agency, Congress has violated the Constitution's separation of powers.

188.    The Authority is not a multimember expert agency, nor is it composed of inferior officers with limited duties and no policymaking or administrative authority.  Rather, the members of the Authority's Board of Directors have wide-ranging duties and the Board exercises substantial policymaking and administrative authority, with the power to craft and enforce regulations.  Thus, neither exception to the President's general removal power applies.  Because the President does not have plenary power to remove the members of the Authority's Board of Directors, HISA is unconstitutional.

189.    Even if one of the two exceptions *did* apply, those exceptions permit only modest *limitations* on the President's removal authority, such as the requirement that the President may remove the person only for good cause.  But the Authority is *completely* unaccountable to the President or to any other part of the federal government.  Congress has no constitutional authority to derogate from the President's executive power by creating such a rogue and unaccountable federal agency.

## **PRAYER FOR RELIEF**

190.    The Plaintiffs demand a judgment against the defendants as follows:

a.    Declaring that HISA violates the Constitution's private non-delegation doctrine and is therefore unconstitutional and void;

b.    Declaring that HISA violates the Constitution's non-delegation doctrine and is therefore unconstitutional and void;

     c.     Declaring that HISA violates the Constitution's anticommandeering principle and the Tenth Amendment and that HISA is therefore unconstitutional and void;

     d.     Declaring that HISA violates the Fifth Amendment's Due Process Clause and is therefore unconstitutional and void;

     e.     Declaring, should the Authority be found to be a governmental entity, that the structure of the Authority violates the Appointments Clause of the Constitution and that HISA is therefore unconstitutional and void;

     f.     Declaring, should the Authority be found to be a governmental entity, that the structure of the Authority violates Article II of the Constitution and the separation of powers and that HISA is therefore unconstitutional and void;

     g.     Enjoining the defendants from taking any action pursuant to HISA;

     h.     Awarding the Plaintiffs their reasonable costs, including attorneys' fees, incurred in bringing this action;

     i.     Awarding the Plaintiffs nominal damages; and

     j.     Granting such other and further relief as this Court deems just and proper.

Dated:  July 15, 2021                              Respectfully submitted,


/s/ Mithun Mansinghani                    /s/ Michael J. Gartland
MITHUN MANSINGHANI*                       MICHAEL J. GARTLAND, ESQ.
  Solicitor General of Oklahoma           DELCOTTO LAW GROUP PLLC
BRYAN CLEVELAND*                          200 North Upper Street
RANDALL J. YATES*                         Lexington, KY 40507
  Assistant Solicitors General            Phone:  895.231.5800
OFFICE OF THE OKLAHOMA                     Email:  mgartland@dlgfirm.com
ATTORNEY GENERAL
313 NE 21st St.                           Local Counsel for Plaintiff
Oklahoma City, OK 73105                   Hanover Shoe Farms, Inc.
Phone:  405-522-4392
Email:  mithun.mansinghani@oag.ok.gov     /s/ Matthew D. McGill
                                          MATTHEW D. MCGILL*
Counsel for Plaintiffs State of Oklahoma, LOCHLAN F. SHELFER*
Oklahoma Horse Racing Commission, and     GIBSON, DUNN & CRUTCHER LLP
Fair Meadows                              1050 Connecticut Avenue, N.W.
                                          Washington, D.C. 20036
                                          Phone:  202.887.3680
                                          Email:  mmcgill@gibsondunn.com

PATRICK MORRISEY†                         Counsel for Plaintiffs Hanover Shoe
  West Virginia Attorney General          Farms, Inc. and United States Trotting
                                          Association
/s/ Lindsay S. See
LINDSAY S. SEE*                           JEFF LANDRY†
  West Virginia Solicitor General           Louisiana Attorney General
OFFICE OF THE WEST VIRGINIA
ATTORNEY GENERAL                          /s/ Elizabeth B. Murrill
1900 Kanawha Blvd. East                   ELIZABETH B. MURRILL**
Building 1, Room E-26                       Solicitor General
Charleston, WV 25305                      BENJAMIN WALLACE**
Phone:  (304) 558-2021                      Assistant Solicitor General
Email:  Lindsay.S.See@wvago.gov           LOUISIANA DEPARTMENT OF JUSTICE
                                          1885 N. Third Street
Counsel for Plaintiffs State of West      Baton Rouge, LA 70804
Virginia and the West Virginia Racing     Phone: (225) 326-6766
Commission                                Email: murrille@ag.louisiana.gov
                                                  wallaceb@ag.louisiana.gov

                                          Counsel for Plaintiff State of Louisiana

/s/ *Michael Burrage*
MICHAEL BURRAGE*
WHITTEN BURRAGE
512 North Broadway Avenue, Ste. 300
Oklahoma City, OK 73102
Phone:  405.516.7800
Email:
mburrage@whittenburragelaw.com

JARED C. EASTERLING*
GREEN LAW FIRM PC
301 E Main St.
Ada, OK 74820
Phone:  580.436.1946
Email:  je@greenlawfirmpc.net

*Counsel for Plaintiff Global Gaming RP,
LLC, d/b/a Remington Park*

*Admitted Pro Hac Vice
**Admission Pro Hac Vice Pending

†Of Counsel

/s/ *Joseph Bocock*
JOSEPH BOCOCK*
BOCOCK LAW PLLC
119 N. Robinson Ave, Suite 630
Oklahoma City, OK 73102
Phone:  405.605.0218
Email:  joe@bococklaw.com

*Counsel for Plaintiff Oklahoma Quarter
Horse Racing Association*

/s/ *Todd Hembree*
TODD HEMBREE*
CHEROKEE NATION BUSINESSES
777 W. Cherokee St
Catoosa, OK 74015
Phone:  918.384.7474
Email:  todd.hembree@cn-bus.com

*Counsel for Plaintiff Will Rogers Downs
LLC*